IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ACCESSIBE LTD.,               )
                              )
          Plaintiff,     )
                              )   C.A. No. 22-792-CFC
      v.              )
                              )   **JURY TRIAL DEMANDED**
AUDIOEYE, INC.,         )
                              )
         Defendant.    )

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT[1]

Plaintiff accessiBe Ltd. ("accessiBe") brings this action for patent infringement against Defendant AudioEye, Inc. ("AudioEye"), and states and alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for patent infringement of arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

2.    accessiBe seeks injunctive relief, monetary damages, attorneys' fees, and costs for AudioEye's unauthorized use and infringement of accessiBe's United States Patent Nos. 9,009,784; 10,331,756; and 11,194,884 (collectively, the "Asserted Patents"). True and correct copies of the Asserted Patents are attached hereto as Exhibits A-C and incorporated herein by reference.

---

[1] AudioEye, Inc. filed a Motion to Partially Dismiss accessiBe Ltd.'s Original Complaint (D.I. 9) on August 8, 2022. This First Amended Complaint is timely filed within 14 days of AudioEye's Motion to Partially Dismiss. It supersedes the Original Complaint and renders the Motion to Partially Dismiss moot.

## THE PARTIES

3.      accessiBe is a limited liability company formed and registered in Israel. accessiBe's United States subsidiary, accessiBe, Inc., is a corporation organized and existing under the laws of the State of Delaware and conducts business in this District.

4.      accessiBe is a leading provider of web accessibility solutions that make websites accessible to persons with disabilities and compliant with the Web Content Accessibility Guidelines ("WCAG") and the Americans with Disabilities Act ("ADA"). accessiBe's proprietary technology is AI-powered and used by over 100,000 websites worldwide to remediate accessibility issues in a manner that is faster and more affordable than traditional solutions. accessiBe has received broad acclaim and customer praise for its innovative web accessibility solutions. Top brands, organizations, and global companies, including Belkin, Goodwill, Johnson & Johnson, Yokohama, General Electric, Philips, Ferrero, Lotus Cars, Pacific Life, UCLA Health, and many others rely on accessiBe for providing web content accessibility to their customers and users. accessiBe has also worked extensively in the disability community to raise education and awareness and collaborated with leading disability organizations such as Viscardi Center, Columbia Lighthouse for the Blind, Center for Independence, and many more.

5.      accessiBe acquired the Asserted Patents from International Business Machines Corporation ("IBM"), another leading innovator in the web accessibility field. The Asserted Patents cover key technologies for providing accessibility solutions at scale and across the Internet. accessiBe acquired the Asserted Patents to protect both its innovative web accessibility technologies and its customer base from infringers and profiteers. accessiBe also has a growing patent portfolio and is actively pursuing patent protection for its new innovations.

6.      AudioEye is an entity organized and existing under the laws of the State of Delaware and maintains a place of business at 5210 E. Williams Circle, Suite 750, Tucson, AZ

85711. AudioEye has appointed National Registered Agents, Inc., 1209 Orange Street, Wilmington, Delaware 19801, as its agent for service of process in this District.

## JURISDICTION AND VENUE

7.      This Court has federal subject matter jurisdiction over this civil action for patent infringement pursuant to §§ 1331 and 1338(a) because it arises under the patent laws of the United States.

8.      This Court has personal jurisdiction over AudioEye because AudioEye is organized and exists under the laws of the State of Delaware and has designated an agent in Delaware for service of process. AudioEye was formed and incorporated in the State of Delaware on May 20, 2005 and is in good standing with the State of Delaware.

9.      AudioEye has engaged in systematic and continuous business activities in Delaware. AudioEye has customers in this District and committed acts of patent infringement with respect to the Asserted Patents in Delaware. AudioEye has infringed and knowingly caused and/or been willfully blind to infringement in the State of Delaware by, among other things, promoting, advertising, offering for sale, and/or selling, infringing services in Delaware and by providing infringing services that are used, offered for sale, sold, and/or purchased in Delaware. The Court's exercise of jurisdiction is appropriate under the applicable jurisdictional statutes and accords with traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because AudioEye is incorporated in the State of Delaware.

## THE PATENTS-IN-SUIT

11.      On April 14, 2015, the USPTO duly and legally issued United States Patent No. 9,009,784 ("the '784 patent"), titled "Automated Correction and Reporting for Dynamic Web Applications," which includes claims 1-20. The '784 patent is based on U.S. Patent Application

No. 14/066,048, filed on October 29, 2013, and is a continuation of U.S. Patent No. 8,613,039. A copy of the '784 patent is attached as Exhibit A.

12.     The '784 patent, generally, discloses computer-implemented methods and systems that (1) detect a run-time application-generated change to dynamic web content that is generated during an application run-time by a dynamic web application, (2) parse the detected run-time application-generated change to the dynamic web content, (3) compare the parsed run-time application-generated change by the dynamic web application to the dynamic web content with the web content compliance rules, (4) identify a noncompliant element associated with the parsed run-time application-generated change by the dynamic web application to the dynamic web content, and (5) perform a run-time correction of the identified noncompliant element within the dynamic web content changed by the dynamic web application.

13.     On June 25, 2019, the USPTO duly and legally issued United States Patent No. 10,331,756 ("the '756 patent"), titled "Accessibility Tagger for Non-Accessibility Enabled Webpages," which includes claims 1-20. The '756 patent is based on U.S. Patent Application No. 15/193,880, filed on June 27, 2016. A copy of the '756 patent is attached as Exhibit B.

14.     The '756 patent, generally, discloses computer implemented methods and systems that (1) retrieve an accessibility tag for a piece of content from a remote tagging repository, (2) modify the piece of content by editing a document object model of the piece of content in accordance with the accessibility tag to enable one or more accessibility features, and (3) render the piece of content with the accessibility features.

15.     On December 7, 2021, the USPTO duly and legally issued United States Patent No. 11,194,884 ("the '884 patent"), titled "Method for Facilitating Identification of Navigation Regions in a Web Page Based on Document Object Model Analysis," which includes claims

1-20. The '884 patent is based on U.S. Patent Application No. 16/445,644, filed on June 19,

2019. A copy of the '884 patent is attached as Exhibit C.

16.     The '884 patent, generally, discloses computer-implemented methods and systems

that (1) analyze a web page for features, wherein the features include selected from the group

consisting of: interactive elements, content regions, link region roots, or landmarks, (2) represent

the features in a tree structure, (3) analyze the tree structure for link density, (4) identify non-

main landmarks, a reading order, and main content roots based on combinations of positions and

link densities for each of the features in the tree structure, and (5) enable a region navigation for

the web page based on the identified non-main landmarks, reading order, and main content roots.

17.     accessiBe owns the entire right, title, and interest in the Asserted Patents,

including the right to enforce the patents and recover damages for patent infringement. *See*

USPTO Assignment Records (Reel/Frame 059533/0435).

## INFRINGEMENT OF THE ASSERTED PATENTS

18.     accessiBe repeats and realleges the above paragraphs, which are incorporated by

reference as if fully stated herein.

19.     On information and belief, AudioEye infringes, continues to infringe, induces

others to infringe, and/or contributes to the infringement of the '784 patent, the '756 patent, and

the '884 patent by making, using, offering to sell, and/or selling within the United States systems

and methods covered by the claims of the Asserted Patents.

20.     The infringing instrumentalities include AudioEye's digital accessibility services,

platform, and related features, including Live Monitoring, automated remediations, AI-driven

fixes, accessibility tags and repositories, overlays, Accessible Menu, Visual Toolkit, PDF and

other document remediations, Issue Reporting, dashboard, and reports (the "Accused

Instrumentalities"). The Accused Instrumentalities are offered for sale, sold, operated, controlled,

and provided by AudioEye without authorization or license and in a manner that infringes each of the Asserted Patents.

21.     AudioEye touts that its digital accessibility platform "deliver[s] website accessibility compliance to business of all sizes." https://www.audioeye.com/post/audioeye-releases-white-paper-on-building-for-digital-accessibility-at-scale/. AudioEye's JavaScript-enabled digital accessibility platform is described as automatically identifying and fixing accessibility errors with digital content, including websites and documents, via accessibility plugins. *See, e.g.*, https://www.audioeye.com/document-remediation-services/, Exhibit D; https://help.audioeye.com/hc/en-us/articles/360042967912-What-are-Continuous-AI-Automated-Fixes-for-Common-WCAG-Errors-; https://www.audioeye.com/post/why-accessibility-plugins-arent-enough-for-ada-compliance/. In its recently released white paper titled "Building for Digital Accessibility at Scale," AudioEye touts that its platform's automated solutions "solve the majority of common accessibility issues." AudioEye also relies on human oversight to address certain accessibility issues that technology cannot solve today. *See*, *e.g.*, https://www.audioeye.com/post/audioeye-manual-testing-and-remediation/, Exhibit E (describing "Current Limits of Automation").



https://www.audioeye.com/post/audioeye-auto-remediations/, Exhibit F.

22.     AudioEye touts that its digital accessibility platform helps AudioEye's customers achieve accessibility compliance by performing three functions: finding, fixing, and monitoring accessibility issues. *See* https://www.audioeye.com/how-it-works/, Exhibit G. First, AudioEye's digital accessibility platform runs automated tests each time a person visits a customer's website "to find accessibility errors and risks that prevent people with disabilities from understanding or interacting" with the website. *Id.* Second, AudioEye's digital accessibility platform automatically fixes accessibility issues with code-based tools while the website loads. *See id.*; https://www.audioeye.com/post/audioeye-auto-remediations/, Exhibit F. Third, AudioEye's digital accessibility platform continuously monitors the website "for new accessibility issues with every visitor" such that the platform can "continue to find and fix issues automatically" as the website content changes. https://www.audioeye.com/how-it-works/, Exhibit G. To the extent AudioEye's digital accessibility platform is unable to automatically identify and resolve accessibility issues with website content, it relies on "human testers" who conduct manual tests and remediations. https://www.audioeye.com/post/audioeye-manual-testing-and-remediation/, Exhibit E.

## How AudioEye Works



| 1 Find | 2 Fix | 3 Monitor |
|---|---|---|
| Automation tests for over 400 accessibility issues | We fix most accessibility issues automatically | Continuously monitor and protect for compliance |

**ADA and WCAG Compliance Plan on Day One**

https://www.audioeye.com/how-it-works/, Exhibit G.

23.     AudioEye's services are provided through digital accessibility compliance plans, which AudioEye offers to customers for a monthly or yearly subscription, leverage AudioEye's digital accessibility platform. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. AudioEye promotes, offers, and sells subscriptions for the following digital accessibility compliance plans: the simple base plan, the advanced base plan, the premier base plan, and the enterprise custom plan. *Id.*



*Id.*



*Id.*

24.    Customers that have an active subscription to one of AudioEye's digital accessibility compliance plans and that install AudioEye's JavaScript on their website get access to AudioEye's digital accessibility platform services and features. *See id.*; https://help.audioeye.com/hc/en-us/articles/360035865671-Does-AudioEye-impact-loading-times-or-site-performance-. AudioEye operates, manages, and controls its customers' websites via its platform features and services to provide accessibility compliance. *See, e.g.*, https://www.audioeye.com/post/is-your-website-accessible-for-people-with-disabilities-heres-why-it-matters/ (explaining that by outsourcing compliance, AudioEye's customers allow AudioEye to manage the customer's website compliance).

## Installation and Implementation

You are solely responsible for installation and implementation of all Offerings on and in connection with your Website(s). By installing or implementing any Offering, you acknowledge and agree that AudioEye is provided with control to apply changes to the rendered document object model ("**DOM**").

https://www.audioeye.com/terms-of-service/, Exhibit J.

WHY AUDIOEYE

# How It Works

Install AudioEye onto your site to give us the level of control required to apply adjustments to the page by adding the necessary markup to existing code.

**No change to your source code.**
**No changes to the look of your site.**

Exhibit I.

25.    Customers that subscribe to an AudioEye digital accessibility compliance plan receive a number of standard features and services, including Live Monitoring, AI-driven fixes, overlays, Visual Toolkit, Issue Reporting, dashboards, reports, and an online support and

helpdesk. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. Customers subscribed to the custom enterprise plan get access to additional features and services, including manual remediations. *See id.* Customers may also purchase add-on services and features, such as PDF and remediations. *See id.*

## AudioEye Features

| Compliance & Protection | Base Plans | Custom Plans |
|---|---|---|
| ADA, Sec 508, AODA, EN 301549, WCAG 2.1 AA | Simple Compliance | Advanced Compliance |
| Issue Reporting Dashboard | ✔ | ✔ |
| Basic Legal Support | ✔ | ✔ |
| **Accessibility Basics** | | |
| Visual Toolkit | ✔ | ✔ |
| 24/7 Help Desk | ✔ | ✔ |
| Dashboard with Analytics & Reporting | ✔ | ✔ |
| Accessibility Statement | ✔ | ✔ |
| **Advanced Technology** | | |
| Live Monitoring | ✔ | ✔ |
| AI-Driven Fixes | ✔ | ✔ |
| Accessibility Score | ✔ | ✔ |
| **Training & Support** | | |
| Online Training Library | ✔ | ✔ |
| Online Support & Helpdesk | ✔ | ✔ |
| Onboarding with Accessibility Specialist | ✔ | ✔ |
| Dedicated Account Executive | N/A | ✔ |
| **Add-On Services** | | |
| Premium Support | Contact Us | ✔ |
| Advanced Legal Support | ↓ | ✔ |
| Custom Training | | ✔ |
| Manual Remediations | | ✔ |
| Additional Webpage Reviews | | Optional |
| PDF Remediation | | ↓ |
| Mobile App Services | | |
| Multimedia Services | | |
| | Start Free Trial | Request a Quote |

*Id.*

26.     The Accused Instrumentalities include AudioEye's automated remediations, AI-driven fixes, and overlay features. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. AudioEye's overlay feature is implemented with "a piece of code" injected into a customer's website that "automatically evaluates the website's code, identifies accessibility issues, and fixes them automatically before the content reaches the screen." https://www.audioeye.com/post/toolbars-verlays-and-testing-demystifying-the-tech-behind-online-accessibility/, Exhibit K. AudioEye also touts its automated remediations and AI-driven fixes. *See* https://www.audioeye.com/post/audioeye-active-monitoring-and-issue-reporting/, Exhibit L. According to AudioEye, the automated remediations feature is a "[c]ompletely automatic code-based tool[] capable of alleviating website accessibility problems in a fraction of a second." https://www.audioeye.com/post/audioeye-auto-remediations/, Exhibit F.



https://www.audioeye.com/how-it-works/, Exhibit G.

27.     The Accused Instrumentalities also include AudioEye's Visual Toolkit feature. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. AudioEye's Visual Toolkit is "a

small piece of code" that is integrated into and displayed on a customer's website.

https://www.audioeye.com/post/toolbars-verlays-and-testing-demystifying-the-tech-behind-

online-accessibility/, Exhibit K. The Visual Toolkit includes a set of tools that make a website

"more personalized based on an individual's specific needs." *Id.* For example, the text size tool

allows an individual to increase the text size to make text on a website easier to read, and the

contrast tool allows an individual with a vision impairment or low vision to toggle a website into

a high-contrast mode. *See id.*



https://help.audioeye.com/hc/en-us/articles/360055441791-How-can-I-determine-the-version-of-

the-Visual-Toolkit-on-my-website- (illustrating the two versions of AudioEye's Visual Toolkit).

28.     The Accused Instrumentalities include AudioEye's Live Monitoring feature (also
referred to as Active Monitoring). *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H.
AudioEye touts its active monitoring feature as "a critical piece of AudioEye's solution that
allows for ongoing accessibility." https://www.audioeye.com/post/audioeye-active-monitoring-
and-issue-reporting/, Exhibit L. The live or active monitoring feature, which is implemented in
software, is deployed each time a website visitor loads a new page on the website and tests for
new accessibility issues with static and dynamic content to maintain "a real-time representation
of a website's accessibility." *Id.* AudioEye touts that its monitoring feature "can find about 70%
of common accessibility issues, using 400+ testing outcomes, and resolve about two-thirds of
them with our suite of more than 70 automated remediations." *Id.*

29.     The Accused Instrumentalities also include AudioEye's Issue Reporting and
dashboard features. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. With Issue
Reporting and dashboards, customers are provided with information and reports including on
accessibility issues found (e.g., by the active monitoring feature), fixed (e.g., by the automated
remediation feature), and/or flagged for manual review. *See*
https://www.audioeye.com/post/audioeye-active-monitoring-and-issue-reporting/, Exhibit L.



*Id.* (illustrating an exemplary issue reporting dashboard).

30.     The Accused Instrumentalities further include AudioEye's PDF or document remediation feature. *See* https://www.audioeye.com/plans-and-pricing/, Exhibit H. AudioEye's PDF remediation feature applies remediations to fix identified accessibility issues. https://www.audioeye.com/document-remediation-services/, Exhibit D. For example, with PDF remediation, tags are applied to certain elements (e.g., headings, images, links, lists, tables) of a PDF document to ensure compatibility with assistive technologies such as screen readers. *See* https://www.audioeye.com/accessible-web-design/documents/.



*Id.*



https://www.audioeye.com/document-remediation-services/, Exhibit D.

**AudioEye's Document Remediation Process**



*Id.*

31.     AudioEye promotes, advertises, offers for sale, sells, and operates its Accused Instrumentalities to and for customers located throughout the United States, including Delaware. AudioEye touts that it has 75,000 active customers that use AudioEye's Accused Instrumentalities. *See* https://www.audioeye.com/press/. AudioEye additionally touts that using the Accused Instrumentalities, it runs over 360 accessibility tests against more than 1,500,000 unique webpages each week. *See* https://www.audioeye.com/post/audioeye-eradicates-barriers-to-digital-accessibility-with-launch-of-machine-learning-powered-audioeye-digital-marketplace-and-team-audioeye/. AudioEye further touts that using the Accused Instrumentalities it applies one billion automated fixes to digital content daily. *See* https://www.audioeye.com/press/.

**AudioEye Stats**

| **75K** | **1B** | **25%** |
|---|---|---|
| active customers | automated fixes applied daily | employees IAAP-certified |

*Id.*

32.     With the Accused Instrumentalities, AudioEye operates, manages, and controls websites for customers in a range of industries, including the automotive industry, the retail industry, the construction industry, the government administration industry, the civic and social organization industry, the hospital and healthcare industry, the hospitality industry, the legal services industry, the higher education industry, the consumer services industry, the restaurant industry, the banking industry, the nonprofit organization management industry, and the recreational facilities and services industry. *See, e.g.*, https://www.audioeye.com/; https://enlyft.com/tech/products/audioeye.

33.     With the Accused Instrumentalities, AudioEye operates, manages, and controls websites for customers that conduct business in Delaware, including the companies identified in the exemplary list of companies attached hereto as Exhibit M.

34.     AudioEye has had knowledge of the Asserted Patents prior to service of the Original Complaint on June 17, 2022. Upon information and belief, AudioEye has a "vigorous" program to develop its own patent portfolio and regularly surveys and inspects relevant patents, including those of competitors and leading innovators in the field. As a result of such activities, it is has encountered and knows each of the Asserted Patents. Indeed, on its website, AudioEye touts that it "invests significant time and resources in research and development," and to protect

those efforts, "AudioEye has vigorously developed a robust intellectual property portfolio."

https://www.audioeye.com/ip/. Further, in its recent Annual Report to investors, AudioEye

publicly acknowledged that "there are a significant number of U.S. and foreign patents and

patent applications in our area of interest" and that it "compete[s] directly against other

companies offering similar products and services" and that many of its competitors "may

develop products superior to [its] current and proposed products." AudioEye, Inc., 2021 Annual

Report 8–9 (2021).

35.     As further evidence of AudioEye's knowledge, the Asserted Patents and other

patents owned by accessiBe and IBM, both innovators in the field, have been cited repeatedly

and heavily across AudioEye's patent portfolio. For example, in relation to the Asserted Patents,

the '756 patent, the '784 patent, related family patents, and their publications, prior to the service

of the Original Complaint, were cited to and/or by AudioEye during the prosecution of

AudioEye's patents, including United States Patent Nos. 10,896,286; 10,928,978; 10,997,361;

11,029,815; 11,061,532; 10,809,877; 10,845,946; 10,845,947; 10,860,173; 10,866,691;

11,080,469; and 11,157,682, and other patent applications assigned to AudioEye. Other patents

owned by accessiBe have also been cited during prosecution of AudioEye's United States Patent

Nos. 10,423,709; 10,444, 934; 10;762,280; and 10,867,120. Each of the Asserted Patents cover

key technologies for providing accessibility solutions at scale and over the Internet and are part

of the "significant" body of U.S. patents in the field that AudioEye has publicly acknowledged

exist and cited to the Patent Office.

36.     Even if AudioEye claims it did not know of any of the Asserted Patents before it

received the Original Complaint, AudioEye's actions constitute willful blindness to the existence

of the Asserted Patents. AudioEye touts that is has a "vigorous" program to develop its own

patent portfolio. https://www.audioeye.com/ip/. AudioEye has also publicly acknowledged that there are a "significant number of U.S. and foreign patents and patent applications" in the web accessibility field and recognized that "there has been, and is likely to continue to be, significant litigation in the industry regarding patents and other intellectual property rights." AudioEye, Inc., 2021 Annual Report 9 (2021). The Asserted Patents and other patents owned by accessiBe are part of a body of foundational patents that have been cited repeatedly and heavily across AudioEye's patent portfolio and/or are highly relevant to AudioEye's digital accessibility services, platform, and related features. Upon information and belief, AudioEye knew that there was a high probability that such relevant patents existed, including the Asserted Patents and other patents assigned to accessiBe, but deliberatively failed to inspect such patents.

37.     Upon information and belief, AudioEye has had knowledge of the Asserted Patents and that its conduct amounted to infringement of the Asserted Patents prior to receiving the Original Complaint. AudioEye is actively pursuing patents in the web accessibility field and has sought to obtain claims in the same field as the technologies disclosed and claimed in the Asserted Patents. AudioEye has also publicly acknowledged that there are a "significant number of U.S. and foreign patents and patent applications" in the web accessibility field and recognized that "there has been, and is likely to continue to be, significant litigation in the industry regarding patents and other intellectual property rights." AudioEye, Inc., 2021 Annual Report 9 (2021). Accordingly, upon learning of the Asserted Patents prior to this lawsuit, AudioEye would have immediately recognized that by making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, it was directly infringing the Asserted Patents. Further, with knowledge of the Asserted Patents, AudioEye has recognized that its inducing and

contributory acts, with respect to the Accused Instrumentalities, cause its customers, their end users, and others to directly infringe the Asserted Patents.

38.     Even if AudioEye claims it did not have actual knowledge that its conduct amounted to infringement of the Asserted Patents prior to receiving the Original Complaint, it was willfully blind to its infringing conduct. Upon information and belief, AudioEye knew that "significant" patent litigation existed and was likely to continue in the industry and would have immediately recognized and subjectively believed upon learning of the Asserted Patents that there was a high probability that by making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, it was directly infringing the Asserted Patents, and by its inducing and contributory acts with respect to the Accused Instrumentalities, it was causing its customers, their end users, and others to directly infringe the Asserted Patents. Further, upon information and belief, AudioEye took deliberative actions to avoid learning of its infringing conduct by for example, continuing to make, use, sell, and/or offer for sale the Accused Instrumentalities and continuing its inducing and contributing acts with respect to its customers, their end users, and others within the United States, without inspecting the objectively high probability that such acts would constitute infringement of the Asserted Patents.

39.     Further, AudioEye has had post-suit knowledge of the Asserted Patents, its direct infringement of the Asserted Patents, and its inducing and contributory acts that cause its customers, their end users, and others to directly infringe the Asserted Patents, as of the service of the Original Complaint on June 17, 2022.

40.     Exhibits N-P are exemplary claim charts comparing claims of the Asserted Patents to the AudioEye Accused Instrumentalities. These claim charts are incorporated herein by reference but are not limiting and do not represent accessiBe's preliminary or final

contentions regarding claim construction or infringement by AudioEye. These positions and contentions will be updated and/or modified in view of discovery and as this case progresses.

## COUNT I: INFRINGEMENT OF THE '784 PATENT BY AUDIOEYE

41.     accessiBe repeats and realleges the above paragraphs, which are incorporated by reference as if fully stated herein.

42.     accessiBe is the assignee and lawful owner of the entire right, title, and interest in the '784 patent.

43.     The '784 patent is valid and enforceable.

44.      accessiBe has never licensed the Accused Instrumentalities under the '784 patent, nor has accessiBe authorized AudioEye to make, sell, and/or offer to sell the Accused Instrumentalities under any claim of the '784 patent.

45.     By making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, AudioEye has infringed and is continuing to infringe at least independent claim 8 and dependent claims 9-13 of the '784 patent either directly or indirectly in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c). The Accused Instrumentalities infringe at least claims 8-13 of the '784 patent literally or by the doctrine of equivalents.

46.     Exhibit N, attached hereto and incorporated herein by reference, includes an exemplary chart that applies independent claim 8 and dependent claims 9-13 of the '784 patent to representative AudioEye Accused Instrumentalities. As set forth in this nonlimiting exemplary chart, AudioEye and its Accused Instrumentalities infringe at least the claims 8-13 of the '784 patent.

47.     Upon information and belief, AudioEye directly infringes at least claims 8-13 of the '784 patent by implementing and practicing the claims by and through AudioEye's Accused Instrumentalities.

48.     In addition, AudioEye is jointly and severally liable for direct infringement of at least claims 8-13 of the '784 patent under 35 U.S.C. § 271(a) by directing or controlling its customers' and/or their end users' implementation of one or more limitations of those claims by providing the Accused Instrumentalities and conditioning use of the Accused Instrumentalities through its terms of service, which require that its customers and/or their end users practice the claims by and through the Accused Instrumentalities. *See, e.g.*, https://www.audioeye.com/terms-of-service/, Exhibit J (providing the terms of service for AudioEye's services).

49.     In addition to directly infringing at least claims 8-13 of the '784 patent under 35 U.S.C. § 271(a), AudioEye has and is continuing to take active steps to induce direct infringement of those claims by its customers and/or their end users under 35 U.S.C. § 271(b) by making, using, selling, and/or offering for sale the Accused Instrumentalities in the United States with knowledge or willful blindness of the '784 patent, with knowledge or willful blindness that the Accused Instrumentalities are specifically designed to operate on websites, documents, and other digital content in an infringing manner, with knowledge or willful blindness that the use of its Accused Instrumentalities by its customers and/or their end users constitutes direct infringement, and by intentionally encouraging infringement of the '784 patent by its customers and/or their end users to take advantage of the unauthorized sales of its Accused Instrumentalities.

50.     AudioEye is also inducing infringement of at least claims 8-13 of the '784 patent by its customers and/or their end users under 35 U.S.C. § 271(b) by providing instructions and/or assistance in the installation and/or operation of its Accused Instrumentalities on customers' websites, documents, or other digital content. *See, e.g.*, https://www.audioeye.com/plans-and-pricing/, Exhibit H (touting its "24/7 Help Desk," "Online Training Library," "Online Support &

Helpdesk," "Onboarding with Accessibility Specialist," and "Dedicated Account Executive"
features available with AudioEye's digital accessibility compliance plans);
https://www.audioeye.com/cms-integrations/ (providing instructions on how to install
AudioEye's JavaScript on a website); https://help.audioeye.com/hc/en-
us/categories/360002251391-Platforms (same).

51.     In addition to directly infringing at least claims 8-13 of the '784 patent under 35
U.S.C. §§ 271(a), AudioEye has and is continuing to contribute to the direct infringement of
those claims by its customers and/or their end users under 35 U.S.C. § 271(c) by selling and/or
offering for sale its Accused Instrumentalities in the United States with knowledge or willful
blindness of the '784 patent, with knowledge or willful blindness that its Accused
Instrumentalities are specifically designed to operate as a material component on its customers'
websites, documents, and other digital content in an infringing manner, and with knowledge or
willful blindness that use of its Accused Instrumentalities by its customers and/or their end users
constitutes direct infringement.

52.     AudioEye's Accused Instrumentalities are not staple articles of commerce, and
there are no substantial noninfringing uses of AudioEye's Accused Instrumentalities other than
as a component in its customers' websites, documents, and other digital content to be used in an
infringing manner. AudioEye's Accused Instrumentalities constitute a material component of the
claimed invention because they are specifically designed to work with the websites, documents,
and other digital content and directly embody significant characteristics of the '784 patent
claims.

53.     AudioEye's infringement of at least claims 8-13 of the '784 patent has caused,
and is continuing to cause, damage and irreparable injury to accessiBe and will continue to suffer

damage and irreparable injury unless and until AudioEye's infringing activities are enjoined by this Court.

54.     accessiBe is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

55.     AudioEye's infringement of the '784 patent has been and continues to be willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284. Upon information and belief, AudioEye's accused actions continue despite an objectively high likelihood that they constitute infringement of the '784 patent.

56.     AudioEye's infringement of the '784 patent is exceptional and entitles accessiBe to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT II: INFRINGEMENT OF THE '756 PATENT BY AUDIOEYE

57.     accessiBe repeats and realleges the above paragraphs, which are incorporated by reference as if fully stated herein.

58.     accessiBe is the assignee and lawful owner of the entire right, title, and interest in the '756 patent.

59.     The '756 patent is valid and enforceable.

60.     accessiBe has never licensed the Accused Instrumentalities under the '756 patent, nor has accessiBe authorized AudioEye to make, sell, and/or offer to sell the Accused Instrumentalities under any claim of the '756 patent.

61.     By making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, AudioEye has infringed and is continuing to infringe at least independent claim 10 and dependent claims 11-14 of the '756 patent either directly or indirectly in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c). The Accused Instrumentalities infringe at least claims 10-14 of the '756 patent literally or by the doctrine of equivalents.

62.    Exhibit O, attached hereto and incorporated herein by reference, includes an exemplary chart that applies independent claim 10 and dependent claims 11-14 of the '756 patent to representative AudioEye Accused Instrumentalities. As set forth in this nonlimiting exemplary chart, AudioEye and its Accused Instrumentalities infringe at least the claims 10-14 of the '756 patent.

63.    Upon information and belief, AudioEye directly infringes at least claims 10-14 of the '756 patent by implementing and practicing the claims by and through AudioEye's Accused Instrumentalities.

64.    In addition, AudioEye is jointly and severally liable for direct infringement of at least claims 10-14 of the '756 patent under 35 U.S.C. § 271(a) by directing or controlling its customers' and/or their end users' implementation of one or more limitations of those claims by providing the Accused Instrumentalities and conditioning use of the Accused Instrumentalities through its terms of service, which require that its customers and/or their end users practice the claims by and through the Accused Instrumentalities. *See, e.g.*, https://www.audioeye.com/terms-of-service/, Exhibit J (providing the terms of service for AudioEye's services).

65.    In addition to directly infringing at least claims 10-14 of the '756 patent under 35 U.S.C. § 271(a), AudioEye has and is continuing to take active steps to induce direct infringement of those claims by its customers and/or their end users under 35 U.S.C. § 271(b) by making, using, selling, and/or offering for sale the Accused Instrumentalities in the United States with knowledge or willful blindness of the '756 patent, with knowledge or willful blindness that the Accused Instrumentalities are specifically designed to operate on websites, documents, and other digital content in an infringing manner, with knowledge or willful blindness that the use of its Accused Instrumentalities by its customers and/or their end users constitutes direct

infringement, and by intentionally encouraging infringement of the '756 patent by its customers

and/or their end users to take advantage of the unauthorized sales of its Accused

Instrumentalities.

66.     AudioEye is also inducing infringement of at least claims 10-14 of the '756 patent

by its customers and/or their end users under 35 U.S.C. § 271(b) by providing instructions and/or

assistance in the installation and/or operation of its Accused Instrumentalities on customers'

websites, documents, and other digital content. *See, e.g.*, https://www.audioeye.com/plans-and-

pricing/, Exhibit H (touting its "24/7 Help Desk," "Online Training Library," "Online Support &

Helpdesk," "Onboarding with Accessibility Specialist," and "Dedicated Account Executive"

features available with AudioEye's digital accessibility compliance plans);

https://www.audioeye.com/cms-integrations/ (providing instructions on how to install

AudioEye's JavaScript on a website); https://help.audioeye.com/hc/en-

us/categories/360002251391-Platforms (same).

67.     In addition to directly infringing at least claims 10-14 of the '756 patent under 35

U.S.C. §§ 271(a), AudioEye has and is continuing to contribute to the direct infringement of

those claims by its customers and/or their end users under 35 U.S.C. § 271(c) by selling and/or

offering for sale its Accused Instrumentalities in the United States with knowledge or willful

blindness of the '756 patent, with knowledge or willful blindness that its Accused

Instrumentalities are specifically designed to operate as a material component on its customers'

websites, documents, and other digital content in an infringing manner, and with knowledge or

willful blindness that use of its Accused Instrumentalities by its customers and/or their end users

constitutes direct infringement.

68.     AudioEye's Accused Instrumentalities are not staple articles of commerce, and there are no substantial noninfringing uses of AudioEye's Accused Instrumentalities other than as a component in its customers' websites, documents, and other digital content to be used in an infringing manner. AudioEye's Accused Instrumentalities constitute a material component of the claimed invention because they are specifically designed to work with the websites, documents, and other digital content and directly embody significant characteristics of the '756 patent claims.

69.     AudioEye's infringement of at least claims 10-14 of the '756 patent has caused, and is continuing to cause, damage and irreparable injury to accessiBe and will continue to suffer damage and irreparable injury unless and until AudioEye's infringing activities are enjoined by this Court.

70.     accessiBe is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

71.     AudioEye's infringement of the '756 patent has been and continues to be willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284. Upon information and belief, AudioEye's accused actions continue despite an objectively high likelihood that they constitute infringement of the '756 patent.

72.     AudioEye's infringement of the '756 patent is exceptional and entitles accessiBe to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT III: INFRINGEMENT OF THE '884 PATENT BY AUDIOEYE

73.     accessiBe repeats and realleges the above paragraphs, which are incorporated by reference as if fully stated herein.

74.     accessiBe is the assignee and lawful owner of the entire right, title, and interest in the '884 patent.

75.     The '884 patent is valid and enforceable.

76.     accessiBe has never licensed the Accused Instrumentalities under the '884 patent, nor has accessiBe authorized AudioEye to make, sell, and/or offer to sell the Accused Instrumentalities under any claim of the '884 patent.

77.     By making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, AudioEye has infringed and is continuing to infringe at least independent claim 1 and dependent claims 2-7 of the '884 patent either directly or indirectly in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c). The Accused Instrumentalities infringe at least claims 1-7 of the '884 patent literally or by the doctrine of equivalents.

78.     Exhibit P, attached hereto and incorporated herein by reference, includes an exemplary chart that applies independent claim 1 and dependent claims 2-7 of the '884 patent to representative AudioEye Accused Instrumentalities. As set forth in this nonlimiting exemplary chart, AudioEye and its Accused Instrumentalities infringe at least claims 1-7 of the '884 patent.

79.     Upon information and belief, AudioEye directly infringes at least claims 1-7 of the '884 patent by implementing and practicing the claims by and through AudioEye's Accused Instrumentalities.

80.     In addition, AudioEye is jointly and severally liable for direct infringement of at least claims 1-7 of the '884 patent under 35 U.S.C. § 271(a) by directing or controlling its customers' and/or their end users' implementation of one or more limitations of those claims by providing the Accused Instrumentalities and conditioning use of the Accused Instrumentalities through its terms of service, which require that its customers and/or their end users practice the claims by and through the Accused Instrumentalities. *See, e.g.*, https://www.audioeye.com/terms-of-service/, Exhibit J (providing the terms of service for AudioEye's services).

81.     In addition to directly infringing at least claims 1-7 of the '884 patent under 35 U.S.C. § 271(a), AudioEye has and is continuing to take active steps to induce direct infringement of those claims by its customers and/or their end users under 35 U.S.C. § 271(b) by making, using, selling, and/or offering for sale the Accused Instrumentalities in the United States with knowledge or willful blindness of the '884 patent, with knowledge or willful blindness that the Accused Instrumentalities are specifically designed to operate on websites, documents, and other digital content in an infringing manner, with knowledge or willful blindness that the use of its Accused Instrumentalities by its customers and/or their end users constitutes direct infringement, and by intentionally encouraging infringement of the '884 patent by its customers and/or their end users to take advantage of the unauthorized sales of its Accused Instrumentalities.

82.     AudioEye is also inducing infringement of at least claims 1-7 of the '884 patent by its customers and/or their end users under 35 U.S.C. § 271(b) by providing instructions and/or assistance in the installation and/or operation of its Accused Instrumentalities on customers' websites, documents, and other digital content. *See, e.g.*, https://www.audioeye.com/plans-and-pricing/, Exhibit H (touting its "24/7 Help Desk," "Online Training Library," "Online Support & Helpdesk," "Onboarding with Accessibility Specialist," and "Dedicated Account Executive" features available with AudioEye's digital accessibility compliance plans); https://www.audioeye.com/cms-integrations/ (providing instructions on how to install AudioEye's JavaScript on a website); https://help.audioeye.com/hc/en-us/categories/360002251391-Platforms (same).

83.     In addition to directly infringing at least claims 1-7 of the '884 patent under 35 U.S.C. §§ 271(a), AudioEye has and is continuing to contribute to the direct infringement of

those claims by its customers and/or their end users under 35 U.S.C. § 271(c) by selling and/or offering for sale its Accused Instrumentalities in the United States with knowledge or willful blindness of the '884 patent, with knowledge or willful blindness that its Accused Instrumentalities are specifically designed to operate as a material component on its customers' websites, documents, and other digital content in an infringing manner, and with knowledge or willful blindness that use of its Accused Instrumentalities by its customers and/or their end users constitutes direct infringement.

84.     AudioEye's Accused Instrumentalities are not staple articles of commerce, and there are no substantial noninfringing uses of AudioEye's Accused Instrumentalities other than as a component in its customers' websites, documents, and other digital content to be used in an infringing manner. AudioEye's Accused Instrumentalities constitute a material component of the claimed invention because they are specifically designed to work with the websites, documents, and other digital content and directly embody significant characteristics of the '884 patent claims.

85.     AudioEye's infringement of at least claims 1-7 of the '884 patent has caused, and is continuing to cause, damage and irreparable injury to accessiBe and will continue to suffer damage and irreparable injury unless and until AudioEye's infringing activities are enjoined by this Court.

86.     accessiBe is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

87.     AudioEye's infringement of the '884 patent has been and continues to be willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284. Upon information and

belief, AudioEye's accused actions continue despite an objectively high likelihood that they constitute infringement of the '884 patent.

88.     AudioEye's infringement of the '884 patent is exceptional and entitles accessiBe to attorneys' fees and costs under 35 U.S.C. § 285.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff accessiBe respectfully requests that the Court enter judgment in its favor and against Defendant AudioEye on the patent infringement claims set forth above, and respectfully requests that this Court:

A.     enter judgment that AudioEye, by reason of the making, using, selling, and/or offering for sale the Accused Instrumentalities within the United States, has infringed and continues to infringe one or more claims of the '784 patent in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c);

B.     award accessiBe all available and legally permissible damages and relief sufficient to compensate accessiBe for AudioEye's infringement of the '784 patent, including to the full extent permitted by 35 U.S.C. § 284, together with pre-judgment and post-judgment interest, in an amount to be determined at trial;

C.     declare AudioEye's infringement of the '784 patent to be willful and award accessiBe treble damages in accordance with 35 U.S.C. § 284;

D.     enter judgment that AudioEye, by reason of the making, using, selling, and/or offering for sale the Accused Instrumentalities within United States, has infringed and continues to infringe one or more claims of the '756 patent in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c);

E.      award accessiBe all available and legally permissible damages and relief sufficient to compensate accessiBe for AudioEye's infringement of the '756 patent, including to the full extent permitted by 35 U.S.C. § 284, together with pre-judgment and post-judgment interest, in an amount to be determined at trial;

F.      declare AudioEye's infringement of the '756 patent to be willful and award accessiBe treble damages in accordance with 35 U.S.C. § 284;

G.      enter judgment that AudioEye, by reason of the making, using, selling, and/or offering for sale the Accused Instrumentalities within United States, has infringed and continues to infringe one or more claims of the '884 patent in violation of at least one of 35 U.S.C. §§ 271 (a), (b), and/or (c);

H.      award accessiBe all available and legally permissible damages and relief sufficient to compensate accessiBe for AudioEye's infringement of the '884 patent, including to the full extent permitted by 35 U.S.C. § 284, together with pre-judgment and post-judgment interest, in an amount to be determined at trial;

I.      declare AudioEye's infringement of the '884 patent to be willful and award accessiBe treble damages in accordance with 35 U.S.C. § 284;

J.      enter both a preliminary and permanent injunction against AudioEye barring and enjoining AudioEye and its officers, directors, agents, attorneys, employees, and assigns, and those acting in privity or in concert with them, from any further acts of infringement of the Asserted Patents until the expiration of the Asserted Patents or until such later date as the Court may determine;

K.    declare this to be an exceptional case under 35 U.S.C. 285 and award accessiBe costs, expenses, and disbursements in this action, including reasonable attorneys' fees; and

L.    award accessiBe such other and further relief as may be permitted and is appropriate at law or equity.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, accessiBe hereby respectfully requests a trial by jury on all issues triable of right by a jury.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff accessiBe Ltd.*

*Of Counsel*:

C. Gregory Gramenopoulos
Gerson Panitch
Kelly Horn
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400

R. Gordon Wright
Troy Viger
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
271 17th Street, NW
Suite 1400
Atlanta, GA  30363-6209
Tel: (404) 653-6400
Fax: (404) 653-6444

Dated: August 22, 2022